Filed 10/2/24  P. v. Dawson CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JERMAINE DAWSON,<br><br>Defendant and Appellant. | B322254<br><br>(Los Angeles County<br>Super. Ct. No. BA499979) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Deborah Brazil, Judge.  Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General for Plaintiff and Respondent.

The jury found Jermaine Dawson guilty of two counts of continuous sexual abuse of a child under the age of 14 against his stepson, J.S. and stepdaughter, K.B.  (Pen. Code,[1] § 288.5.)

On appeal, Dawson contends that the trial court erred by admitting J.S.'s and K.B.'s hearsay statements under Evidence Code sections 1236 and 791; permitting a facility dog and a support person to accompany J.S. and K.B. while they testified; and giving an adoptive admission instruction that was not supported by the evidence.  He further contends that the prosecutor committed misconduct during closing argument.

## FACTS

### A. *Prosecution Evidence*

#### 1. J.S.

Dawson met J.S. and K.B.'s mother Nicole[2] at church, where Dawson played the organ.  Nicole married Dawson when J.S. was five years old and K.B. was a baby.  Dawson and Nicole had a daughter, G., after they married.  Later they had twins, a daughter and a son.

J.S.'s biological father was not in his life.  Dawson was a "father figure" to J.S., who called him "dad".  J.S.'s relationship with Dawson changed when Dawson began molesting him, which "did [his] head over."  Dawson first abused J.S. when J.S. was

---

[1] All further statutory references are to the Penal Code.

[2] We refer to Nicole by her first name because she shares Dawson's last name.

2

nine or ten years old.  When no one else was home, Dawson called J.S. into the living room to "check" his privates and body. Dawson grabbed J.S.'s hand and moved it up and down on Dawson's penis until he ejaculated.  Afterwards, Dawson apologized and made J.S. promise not to say anything.  J.S. went into the bathroom and cried.  J.S. did not tell anyone what happened.

When J.S. was almost 11 years old, Dawson asked him to orally copulate him.  J.S. masturbated Dawson manually until he ejaculated instead.  J.S. felt "effed up in the head" after this happened and could not sleep.  Dawson made J.S. masturbate him with increasing frequency as J.S. grew older.

When J.S. was almost 12 years old, Dawson forced J.S. to watch pornography with him while they both masturbated. Around the same time, Dawson began touching J.S.'s penis regularly when J.S. was trying to sleep.  Dawson would attempt to masturbate J.S. or orally copulate him in the middle of the night.  This continued regularly.  J.S. did not feel there was anything he could do but comply.  J.S. had trouble sleeping because of the abuse.

Dawson orally copulated J.S. when J.S. was about 12 years old.  This continued until J.S. was 15 or 16 years old.  J.S. put lotion on his hand to make Dawson believe that he ejaculated because Dawson would check.  Dawson always said he was checking J.S.'s penis for bumps.

When J.S. was between 12 and 14 years old, Dawson took J.S.'s pants off and tried to put his penis in J.S.'s anus.  J.S. pushed Dawson away so he could not do it.  Dawson sexually abused J.S. until he was 16 or 17 years old.

J.S.'s relationship with his mom was "perfect" before Dawson abused him. After the abuse began, J.S. started arguing and getting into trouble. J.S. tried to be happy, but he could not do it. J.S. tried to "maintain with all that crap all these years, maintaining and . . . trying not to spaz out and just go all crazy."

J.S. never told his biological father about the abuse because they "didn't have a connection" and he did not think his father would care. J.S.'s mother would not believe him if he told her. She was in denial.

When he was 16 or 17 years old, J.S. learned that Dawson was also abusing K.B. He heard K.B. crying one night. They talked and disclosed the abuse to each other. J.S. did not take any action after he learned Dawson was abusing K.B. because "[t]here was no point."

J.S. had his first son, J., when he was 17 years old. Dawson helped J.S. take care of J. J.S. let Dawson help because he had to work and go to school. The only other help he had was his mother. J.S. checked in with J., and never heard that Dawson did anything to harm him.

In April of 2020, J.S. told his aunt Latoya that Dawson had abused him. J.S.'s aunts and cousins were supportive of him. They went with J.S. and K.B. to report Dawson to the police.

At the time of trial, J.S. was 24, and had two sons who were seven and three years old. J.S. suffered a felony conviction for assault in 2019.

4

## 2. K.B.

K.B. and Dawson had a good relationship when he first married Nicole. That changed after K.B.'s biological father died. K.B. was about six years old at the time.

The first time Dawson molested her, K.B. was in second grade. Dawson showed K.B. how to use her hands to "jack him off". Dawson told K.B. not to say anything to anyone about what happened. He made K.B. masturbate him "a lot" after the first time.

While K.B. was still in elementary school, Dawson came into the room she shared with her two younger sisters at night and licked her vagina. K.B. moved around a lot so that Dawson would stop. This happened two or three times. Afterwards Dawson pulled up K.B.'s underwear and pretended that nothing happened. K.B.'s sisters did not wake up, and K.B. did not tell anyone that it happened.

At around the same time, Dawson began taking K.B. out of bed when she was sleeping, bending her over at the waist, and "dry humping" her. Dawson fondled K.B.'s bare breasts while he "dry humped" her.

After K.B.'s body began to mature, Dawson started putting his mouth on her breasts and licking and sucking them. He also touched her breasts with his hands. Afterwards Dawson told her, " 'Don't tell anybody, like, you know what's going to happen.' " K.B. thought that meant that her mother would "whup" her if she told. Dawson licked K.B.'s breasts "[l]ike every other night" after the first time. K.B. could not remember if Dawson started licking

5

her breasts when she was less than 14 years old. Dawson told her he was checking her for breast cancer.

Dawson continued to molest K.B. until she was a senior in high school.

When K.B. was in second grade, she told her cousin P. that Dawson was abusing her. P. told her mother Latoya. They were at her grandmother's house at the time. Latoya called Nicole and spoke to her. When Nicole picked K.B. up, she repeatedly asked K.B. what happened. K.B. could not remember everything she told Nicole, but she knew that she told Nicole that Dawson made K.B. masturbate him. Once home, Nicole and K.B. woke Dawson and talked to him about it.[3] After K.B. and Nicole confronted Dawson, Nicole continued to leave K.B. alone with him. Nicole isolated K.B. and her siblings from their extended family. K.B. did not try to talk to her mother about what Dawson was doing again after that because she was too scared.

In April of 2020, when K.B. was 17, J.S. called K.B. at work and said he wanted to tell their mother everything that Dawson had done to them. Soon after, K.B.'s aunt Latoya called her and asked K.B. if Dawson was touching her. K.B. lied at first but then admitted Dawson abused her. Latoya started crying and told K.B. she was going to come get her. K.B. and Latoya went to K.B.'s grandmother's house where the family, including J.S., gathered to discuss Dawson. J.S. was angry and told everyone what Dawson had done. K.B. sat there and cried because she did not know what was going to happen. K.B. wanted to call her mother before she reported Dawson to the police. When K.B.

---

[3] K.B. did not remember what Dawson said when she testified at trial. Her memory was fresher when she first reported the incidents to the police a few years earlier.

called, Nicole got angry, told K.B. that she could not come home, and called her stupid. Afterwards, her mother called J.S. and said that he could not come home, either. When K.B. was little her mother was her best friend. That ended when K.B. reported Dawson to the police.

Between her disclosure in second grade and Dawson's arrest in April 2020, K.B. did not tell anyone what happened except her brothers and sisters. She "tried to suppress that as best as I can by not talking about it . . . ." K.B. believed she would "get in trouble for it happening to me." Dawson had warned her not to tell anyone every time he molested her. The family attended church regularly, but K.B. had not known her pastor very long. K.B. did not tell her pastor that Dawson abused her because she was embarrassed. K.B. was afraid to talk to her mother about it. She had already talked to her and "nothing changed." "He was still in the house."

When she was in high school, K.B. told Dawson to stop many times. She tried to make loud noises so that someone would see him molesting her. Sometimes when K.B. told Dawson to stop she was crying. "He would just say he's sorry and continuously keep doing the same thing."

### 3.   Latoya Johnson

When K.B. was in first or second grade, K.B. disclosed to Latoya that Dawson was abusing her. Latoya immediately discussed the situation with Nicole. Nicole told her that K.B. said Dawson made her masturbate him until he ejaculated. Nicole denied the accusation and said that J.S. was the one who was masturbating. Latoya said J.S. was too young to be

7

masturbating—someone must have taught him. Nicole responded that Dawson caught J.S. masturbating. Dawson told J.S. not to do it in front of K.B., and to go to the bathroom. Latoya said that she thought Nicole should investigate because J.S. must have learned to masturbate from someone else. Soon afterwards, Nicole isolated herself and the children from Latoya and they moved away.

On a Friday night in April 2020, J.S. called the family together because he was going to talk to Nicole and he needed support. J.S. told the family what Dawson did to him and said that Dawson had also abused K.B. Latoya called K.B. to confirm that it was true and then went to pick K.B. up from work. Latoya and K.B. called Nicole. When she answered, Nicole asked, " 'What the F is going on? What the F are you guys doing?' " K.B. asked her mother to come to her grandmother's house, but Nicole did not come. K.B. went home with Latoya. K.B. called Nicole again from Latoya's house and Nicole said, "You're a F'ing traitor. You're with Toy. You're dead to me." K.B. cried and kept saying that she knew her mother would be angry. K.B. tried to call Nicole again, but could not reach her.

That Sunday, J.S. called and told K.B. he was going to the police. K.B. agreed to go, too, and Latoya drove them there. Latoya also drove K.B. to Stuart House, where K.B. and J.S. were interviewed by a professional trained to interview children in these circumstances.

When K.B. disclosed in second grade, Latoya did not report Dawson's abuse of K.B. to the authorities. She felt that it was her responsibility to tell Nicole, and she believed Nicole would handle the situation.

**B.**   *Defense Evidence*

### 1.   <u>Paul Grimes</u>

Pastor Paul Grimes met Dawson when he chose Dawson to be the minister of music at his church.  At the time of trial, they had known one another for approximately four years.  The Dawson family joined the church as "a package deal."  Dawson had been a great friend to the pastor.  They grew closer over time and would talk on the phone.  Pastor Grimes knew J.S. and K.B.  The pastor served as a mentor to J.S.  He interacted less frequently with K.B., but had a high opinion of her.  When Pastor Grimes observed Dawson and J.S. they appeared to have a harmonious father/son relationship.  Dawson and K.B. also appeared to have a good relationship.  Pastor Grimes watched Dawson interact with children under the age of 14 years old, and they all loved him.  He did not believe Dawson was the kind of person who would abuse children.

Pastor Grimes had only known the family for about 18 months when J.S. and K.B. reported that Dawson abused them.  He had no interaction with the family between 2007 and 2017.  Pastor Grimes had not spoken to Dawson following his arrest.  He had not called Dawson on the phone.  The pastor had never been to Dawson's home and Dawson had never come to the pastor's home.

### 2.   <u>Nicole Dawson</u>

Nicole and K.B. were best friends when K.B. was a child and they talked about everything.  Neither J.S. nor K.B. ever told

9

Nicole that Dawson molested them. If they had, "it would have been dealt with." She would not allow anyone to hurt her children. If Nicole found out that Dawson touched J.S. or K.B., she would kick Dawson out of the house if she did not kill him first.

Nicole did not recall Latoya ever telling her that Dawson touched J.S. or K.B. If she had, Nicole would have investigated and protected them.

No one told Nicole what was happening on the Friday night in April 2020 when the family met at her parents' house to talk about Dawson's abuse of J.S. and K.B. Nicole denied telling K.B. that K.B. was "dead to [her]." Nicole never called J.S. or K.B. a "traitor."

When the children were growing up, Nicole worked during the day from Monday through Friday. Dawson would pick all of the kids up from school and take care of them until Nicole get back from work. Dawson did not have a lot of one-on-one time with the children at the house. They were always in school or at aftercare.

Nicole never saw Dawson inappropriately touch any of her children. It was not in Dawson's character. In Nicole's opinion, children loved Dawson. There were always children at their house—both family and neighbors.

### 3. __Dawson__

Dawson denied ever sexually touching J.S. or K.B., and denied that either J.S. or K.B. touched him. Dawson would "never harm a child ever" because he is "a god-fearing man." Nicole never confronted Dawson about molesting J.S. or K.B.

J.S. and K.B. lied about the molestation.  Dawson stayed home and took care of the house when he was between jobs several times, but he was never alone in the house with J.S., and never went into the children's rooms at night.

When Dawson and Nicole first married, J.S. and K.B. called him "dad."  Dawson played the organ at church, and J.S. and K.B. accompanied him on the drums.  Later, J.S. did not like Dawson being his father.  J.S. frequently broke rules that Nicole and Dawson set for him.  J.S. was defiant and would curse at Dawson.  J.S. was living with Dawson and Nicole when J.S.'s first son J. was born.  When J.S. moved out of the house at age 17, J. stayed.  J. lived with Dawson and Nicole during the week and lived with his mother on weekends.  Dawson drove J. to and from school every day for approximately two years.

Dawson had worked at approximately five schools.  He was a teacher's assistant in the Los Angeles School District for two different periods of approximately two years each.  He worked with children in elementary school, watching them and helping with their studies.  Dawson worked with the children both inside and outside of the classroom.  Dawson also worked as a campus aide for the Los Angeles School District at multiple elementary schools.  As a campus aide he monitored the children to make sure they played fairly.  Dawson was not aware of any children registering complaints about him while he worked for the Los Angeles School District.

Nicole's family, and Latoya in particular, did not want Nicole to marry Dawson.  Dawson did not feel welcomed at family gatherings.

# DISCUSSION

## A. *Admission of Prior Consistent Statements*

### 1. Proceedings

J.S. was the first witness to testify for the prosecution. During the lunch recess, the trial court held a hearing to resolve issues related to J.S.'s testimony. The hearing was held outside the presence of the jury and was not reported. Following J.S.'s continued testimony, the trial court asked the attorneys whether there were similar issues to resolve related to K.B.'s testimony. Defense counsel did not bring any additional issues to the trial court's attention.

Throughout his examination of J.S., defense counsel asked questions that implied J.S. had several motives to fabricate testimony, including his poor relationship with Dawson, his history of lying, and the feud between his mother and his Aunt Latoya. Defense counsel also asked J.S. if he received financial assistance "with regard to your participation in this case," whether there was anything J.S. would "care to share along the lines of any type of benefit or compensation or any special treatment you're receiving from a governmental entity or the prosecutor's office or the deputy district attorney's office or any other office that might be assisting you," and whether J.S. was "receiving any type of financial aid or benefit from the prosecutor's office with regard to your involvement or participation in this case?"

When questioning K.B. the next day, defense counsel implied several potential reasons for K.B. to fabricate testimony, including the influence of her Aunt Latoya and possible pressure from the prosecutor and the investigating detective.[4]

On the third day of testimony, investigating officer Los Angeles Police Department Detective Jason Kim testified that he worked at Stuart House as part of a team of individuals from multiple disciplines who provided services to victims of child sexual abuse. Immediately after J.S. and K.B. reported Dawson

---

[4] Defense counsel's line of questioning included the following:

"[Defense Counsel]: On the subject of whether anyone has instructed you on what to say in court as your testimony, your answer is that no one has instructed you how to testify; is that correct?

"[K.B.]: Yes.

"[Defense Counsel]: Have you had any private meetings in the presence of [the prosecutor]? Yes or no?

"[K.B.]: Private meetings? What do you mean?

"[Defense Counsel]: Meeting with the two of you together, talking.

"[K.B.]: No.

"[Defense Counsel]: Have you talked with [the prosecutor] privately, the two of you, or in the company of a third person, such as this gentleman here that I'm pointing to?

"[K.B.]: [Detective] Kim?

* * *

"[Defense Counsel]: Yeah, Detective Kim. That's right.

"[K.B.]: Yes. Every conversation we've had has always been with me, Abby, and Detective Kim.

"[Defense Counsel]: Okay. And how many of those conversations have you had?

"[K.B.]: I don't remember."

to the police, a child advocate from Stuart House conducted forensic interviews of both victims, which Detective Kim observed in an adjacent room through a one-way mirror. The detective summarized the crimes that J.S. suffered, and authenticated the video recording of J.S.'s forensic interview. A video recording of J.S.'s interview was marked for identification and the transcript of the interview was published to the jury. The prosecutor noted that defense counsel had previously been provided copies of the transcript. Defense counsel then interjected: "Your honor, just for the record, there is an objection to the interview as being hearsay." The trial court overruled the objection. The video recording was played for the jury.

The court recessed for lunch and the jurors left the courtroom. The trial court then said, "[Defense counsel], I want to make a complete record regarding your objection to the playing of the audio as hearsay. The objection is overruled pursuant to Evidence Code section 1236, prior consistent statement as the evidence is in compliance with Evidence Code section 791. So on that basis, the court is overruling your hearsay objection as to the audio that the court is listening to and the jury is listening." Defense counsel then objected that "the audio recording is more inclusive than simply prior consistent statements or inconsistent statements." The trial court concluded, "Very well. Your objection is noted for the record." Defense counsel thanked the court and confirmed that he had nothing further he wished to discuss.

Detective Kim's testimony resumed following the lunch recess. The detective testified that he viewed K.B.'s forensic interview through the one-way mirror. The detective summarized the crimes that K.B. had suffered, and

14

authenticated a video recording of her Stuart House interview. The video recording of K.B.'s interview was marked for identification and played for the jury.

Defense counsel cross-examined Detective Kim. The detective testified that he did not personally interview either J.S. or K.B., and had not talked to them about the case.

At sidebar, the court inquired whether defense counsel objected to J.S. and K.B.'s recorded interviews being admitted into evidence. Defense counsel stated that he had previously objected to admission of J.S.'s interview and added: "I now object to [admission of the transcript of K.B.'s interview], based on the fact that the entire transcript is hearsay. However, I keep in mind Evidence Code [section] 1235, but I still feel it's inadmissible hearsay." The court admitted the recordings of J.S. and K.B.'s Stuart House interviews into evidence.

### 2. **Legal Principles**

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' (Evid. Code, § 1200, subd. (a).) Hearsay is not admissible unless it meets the requirements of one of the exceptions set forth in Evidence Code sections 1220 to1390. (Evid. Code, § 1200, subd. (b); see also *People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)" (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 774.)

Evidence Code section 1236 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his

15

testimony at the hearing and is offered in compliance with [s]ection 791."

Evidence Code section 791 in turn provides:  "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:  [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

"Evidence Code section 791 does not require a witness to be free from all possible bias at the time of her prior consistent statement.  Rather, 'a prior consistent statement is admissible if it was made before the existence of any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony.' [Citations.]"  (*People v. Dalton* (2019) 7 Cal.5th 166, 234.)  "That there may always have been present a motive to fabricate does not deprive a party of his right to show that another motive, suggested by the evidence, did not also affect his testimony." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1014; see also *People v. Dalton*, at p. 234.)  " '[T]he mere asking of questions may raise an implied charge of an improper motive . . .,' and thus invoke Evidence Code section 791."  (*People v. Noguera* (1992) 4 Cal.4th 599, 630.)

16

"A trial court's ultimate ruling on admissibility 'implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute.' (Evid. Code, § 402, subd. (c).)" (*People v. Selivanov*, *supra*, 5 Cal.App.5th at p. 774.) "[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception[.]" (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 132.) "We review the trial court's conclusions regarding foundational facts for substantial evidence and its decision to admit or exclude a hearsay statement for abuse of discretion. (*Ibid.*) We review the ruling, not the rationale; '[t]he ruling must be upheld if the evidence was admissible under any hearsay exception.' (*People v. Karis* (1988) 46 Cal.3d 612, 635.)" (*People v. Selivanov*, at p. 774.)

The trial court's erroneous admission of hearsay as substantive evidence is harmless if it is not reasonably probable that the result would have been more favorable to the defendant had the evidence not been admitted. (*People v. Kopatz* (2015) 61 Cal.4th 62, 86–87 [admission of hearsay evidence evaluated under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836.) " '[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.' " (*People v. Partida* (2005) 37 Cal.4th 428, 439.)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1209.)

3.    Analysis

On appeal, Dawson contends that the trial court acted as an advocate for J.S. and K.B. by:  (1) proffering Evidence Code

17

section 1236 as a hearsay exception justifying admission of J.S. and K.B.'s Stuart House interviews, (2) failing to require the prosecution to identify how the interviews were admissible under Evidence Code section 791, and (3) "deciding the statute's foundational requirements had been met without knowledge of the parties." Dawson further contends that neither of the foundational requirements of Evidence Code section 791 was met. Alternatively, Dawson argues that the trial court erred by admitting the interviews in their entirety because not all of the statements J.S. and K.B. made qualify as consistent statements pursuant to Evidence Code sections 1236 and 791. Dawson argues that these errors violated both state law and his constitutional right to due process. We conclude that the majority of J.S. and K.B.'s statements in the Stuart House interviews were admissible under the prior consistent statement exception to the hearsay rule. We further conclude that Dawson suffered no prejudice through the admission of the statements that the opening brief identifies as inadmissible under the exception.

There is no basis in the record for Dawson's assertions that the trial court erred by proffering a basis for admission of the interviews, failing to require the prosecution to prove the foundational requirements for admission pursuant to Evidence Code section 791, or deciding that the foundational requirements for admission were met without comment. The hearing on the admissibility of J.S.'s interview was not reported, and the discussion of the admissibility of K.B.'s interview was limited to defense counsel's statement that he objected to it on the same grounds and because "the entire transcript is hearsay." After the transcript of J.S.'s interview was published to the jury, defense

18

counsel made a cursory hearsay objection "just for the record", and, to ensure that the record was complete, the court subsequently reiterated that it had made its ruling pursuant to Evidence Code sections 1236 and 791. There is simply no way to discern what transpired at the evidentiary hearing on the Stuart House interviews in light of the fact that they were not reported. Regardless, none of these contentions would have an impact on our resolution of the issue. With exceptions that do not apply here, the trial court's ruling on admissibility "implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary. . . ." (Evid. Code, § 402, subd. (c).) Moreover, whatever the trial court's basis for admitting hearsay evidence, we will not overturn the court's ruling if the evidence is admissible under a hearsay exception. (*People v. Karis* (1988) 46 Cal.3d 612, 635.) We conclude that the evidence is admissible pursuant to Evidence Code sections 1236 and 791, as the trial court stated.

The Stuart House interviews meet the temporal requirements of section 791, subdivision (b). By questioning J.S. regarding whether he was receiving monetary or other benefits from the District Attorney's Office or some other government agency for participating in the trial, defense counsel implied that J.S. had fabricated his trial testimony in order to receive a benefit. The District Attorney did not become involved in the case until after J.S. made his statements in his Stuart House interview. Thus, J.S.'s consistent statements were made before the alleged bias or motivation arose. Similarly, defense counsel's questioning of K.B. implied that the prosecutor was pressuring her to fabricate testimony. The prosecutor did not meet with K.B. until after K.B. was interviewed at Stuart House.

19

Accordingly, K.B. made her consistent statements before the prosecutor would have had an opportunity to pressure her.

Although Dawson complains broadly about the content of the Stuart House interviews, he does not expressly contest that the vast majority of statements J.S. and K.B. made in their interviews were consistent with their trial testimony. We address below the specific objections Dawson raised in the opening brief.[5]

---

[5] We decline to address the opening brief's recitation of statements that Dawson has not supported with argument. These statements include, but are not limited to, J.S.'s statement that he told the interviewer and police "what they needed to know," J.S. and K.B.'s opinions and feelings regarding their mother and Dawson, and J.S.'s references to Dawson by derogatory terms.

### a. Stuart House Interviewer's "Approval" Language

Dawson argues that the Stewart House interviewer's responses to J.S. and K.B.'s statements affirmed the truth of their statements and constituted "impermissible coaching." As examples, Dawson catalogs the numerous times that the interviewer responded "okay," "uh huh," "yeah," "hmm," "I see," "right," "all right," and "got it" in each interview. We are not persuaded that the jury would view the interviewer's responses as confirming the truth of what J.S. and K.B. said. It is hard to conceive of more neutral language. The words and sounds the interviewer employed were the sort of brief acknowledgements that people routinely use to confirm to another person that they are listening. Dawson was not prejudiced by their admission.

### b. Stuart House Interviewer's Opinions

Dawson further contends that some of the interviewer's statements to J.S. during his Stuart House interview could be construed by the jury as expert opinions—specifically that in her experience it was common for child molesters to have a positive connection to the children they molest that makes the children want to be around them and that child molesters "do special favors or give kids stuff so that they'll keep them from saying something."

Even if we assume that the interviewer's statements were beyond the scope of the average layperson's knowledge and that the jury considered them to be the opinions of an expert, we

21

cannot say that they were prejudicial, as the statements were largely inconsistent with J.S. and K.B.'s statements and testimony. Although both victims initially had a positive experience with Dawson, the connection changed when the molestation began. Neither J.S. nor K.B. wanted to be around Dawson after he started abusing them. J.S. and K.B. did not try to disclose what was happening after their first early attempts because when they did "nothing changed . . . [h]e was still in the house"—not because they wanted to be close to Dawson. K.B. did not state or testify that Dawson gave her things or did anything special for her. He kept her silent by saying " 'don't tell anybody, look, you know what's going to happen[.]' " K.B. thought she would get into trouble if she told, and that her mother would "whup" her. J.S. said Dawson never did anything special for him—J.S. had only gone to the movies once in his life. J.S. stated that he was not sure if Dawson was trying to do something special when he came to J.S.'s school when J.S. misbehaved, or if Dawson simply did not want J.S.'s mother to go because J.S. might feel greater pressure to tell her about the abuse under the circumstances. Given that J.S. and K.B.'s testimony was only minimally corroborated by the interviewer's opinions, it is not reasonably probable that the outcome of the trial would have been more favorable to Dawson if the interviewer's statements had been redacted from J.S.'s interview.

> c. *Stuart House Statements Used as a Blueprint for Testimony*

Dawson contends that J.S.'s Stuart House statements corroborated J.S.'s testimony because the prosecutor used the

Stuart House interview as a blueprint for questioning J.S. at trial. Dawson fails to explain why the prosecutor should be prohibited from asking the same questions that the interviewer did to elicit relevant, admissible responses. The jury heard both the Stuart House interviewer and the prosecutor question J.S., and could determine for themselves whether the questions were similar and decide independently what weight to afford J.S.'s testimony in light of any perceived similarities.

### d.     Other Potential Child Victims

Dawson argues that J.S. and K.B.'s Stuart House interviews raised the specter of other potential child victims to whom Dawson had ongoing access, either through family or work. However, the issue was raised much earlier in the trial by defense counsel, as a means of undermining J.S.'s credibility. In his opening statement, counsel commented: "[J.S.], the older of the stepkids, has two of his own children. [¶] Having two of his own children, he would regularly allow Mr. Dawson to take care of those kids. Particularly, one of them that was age 4, Mr. Dawson would drive that child to and from school and other places. Think about that. Someone who has been sexually abused, allowing his child to be in the company of a sexual abuser."

At trial, both attorneys questioned J.S. regarding Dawson's care of J.S.'s elder son. J.S. testified that Dawson participated in J.'s care, and that despite his concerns J.S. had no reason to believe that Dawson had harmed either of his children.

When the Stuart House interviewer questioned J.S. regarding his son's safety in his Stuart House interview, J.S.

23

responded, consistent with his trial testimony, that he worried about Dawson molesting J., but had nevertheless permitted Dawson to pick his son up from school and take him to get food. J.S. indicated that, to his knowledge, Dawson had not harmed his son. The Stuart House interviewer also questioned J.S. regarding whether Dawson had contact with children through work and if so, whether J.S. was concerned that Dawson had abused those children. J.S. said that Dawson had worked with children. J.S. was suspicious of Dawson and tried to check to see if anything had happened, but ultimately J.S. did not know of anyone that Dawson molested other than himself and K.B. J.S. told the interviewer: "No, I didn't hear of problems. I kept hearing, you know, he's a good teacher, . . . he loves the kids and he plays music . . . ." When the interviewer questioned K.B. regarding whether she believed Dawson had molested her brothers and sisters other than J.S., K.B. unequivocally answered "No."[6]

---

[6] The opening brief misconstrues the statements K.B. made in her Stuart House interview regarding her sister G. K.B. did not state that she prayed Dawson had not molested G. K.B. stated that G. interrupted Dawson when he was in K.B.'s room touching K.B.'s breasts, but that G. did not understand what Dawson was doing because Dawson quickly pulled down K.B.'s bra and told G. he was "just praying for" K.B. K.B. stated that she felt good telling her brothers and sisters what happened, because if it happened again she would not be the only one who knew what had happened to her. She did not say she felt good telling her brothers and sisters that Dawson was a child molester. Nor did K.B. state that she believed Dawson was molesting G. because he was in G.'s bedroom too often. K.B. told the Stuart House interviewer that she thought her brother and sisters believed her when she told them Dawson had molested

In closing argument, defense counsel used Dawson's access to children through work to bring both J.S. and K.B.'s credibility into question:  "[Dawson]'s had jobs where he is around children for many years particularly in the schools that he worked at. Hear of any inappropriate sexual touching or conduct with regard to any—anyone uh—of the kids he supervised while he was in that position?  I imagine if the prosecution had that type of proof or evidence you would have heard about it but you didn't hear about that."[7]

In light of the fact that both J.S. and K.B. denied knowledge of any other child who Dawson molested, we cannot say that introduction of their statements was prejudicial.  To the contrary, to demonstrate Dawson's trustworthiness with children and undermine J.S. and K.B.'s claims, counsel argued that Dawson had frequent contact with children, yet J.S. and K.B. were the only alleged victims.

### e.    No Limiting Instruction

We reject Dawson's contention that the trial court gave CALCRIM No. 318 regarding prior consistent statements without giving a limiting instruction.  Dawson forfeited the argument by

---

her because "it will be too many times where he'll be in my room by hi[mself] . . . ."

[7] Dawson argues that the prosecutor intimated that Dawson had other victims in her closing argument.  The prosecutor did not broach the subject in her argument to the jury; she briefly responded to defense counsel's argument in her rebuttal, stating that the issue at trial was not whether Dawson abused other children, but whether he abused J.S. and K.B.

failing to request a limiting instruction at trial.  (See *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 [failure to timely raise an issue in the trial court forfeits the issue for appellate review].)

### f. Use of Stuart House Statements in Closing Argument

Dawson argues that the prosecutor used J.S. and K.B.'s Stuart House interviews to argue that they had been consistent in their statements.  This was a proper use of their prior statements after Dawson brought their credibility into question pursuant to Evidence Code sections 1236 and 791.

Dawson asserts that by referring to the interviews as "forensic," the prosecutor misled the jury into believing that the interviews were scientific and accurate.  As Dawson acknowledges, "forensic" means relating to or being used in a court of law.  This is an accurate description of the Stuart House interviews.

Dawson states that the prosecutor used K.B.'s Stuart House statement that she would be traumatized by what Dawson did to her to argue that J.S. and K.B. would suffer for the rest of their lives because of Dawson's breach of their trust.  We find no prejudice.  In his trial testimony, J.S. stated that his connection with Dawson had been "great"—so much so that J.S. called Dawson "dad."  When Dawson asked J.S. to masturbate him, J.S. was "shocked" and it "did [his] head over."  K.B. also testified that she had a good relationship with Dawson before he began regularly abusing her over a period of approximately 10 years.  The prosecutor had ample independent evidence supporting her

26

argument. Dawson was not prejudiced by admission of K.B.'s Stuart House statements.

Dawson complains that the prosecutor asked the jury to focus on J.S. and K.B. and not to consider any other victims who might or might not exist. The prosecutor's comment was made in direct response to defense counsel's statement that Dawson had worked with other children without incident, and that if there had been other victims the prosecution would have presented that evidence. The prosecutor's brief response to the argument did not prejudice Dawson.

Finally, in closing argument the prosecutor did not quote K.B.'s Stuart House statements when she argued that if a person consistently recounts the same facts it is likely that the facts are true; she simply stated a commonly-held belief. Dawson was not prejudiced by the prosecutor's reliance on a general statement that the jurors were free to accept or reject depending on their own experiences.

In sum, the majority of J.S. and K.B.'s Stuart House statements were admissible, but admission of those statements that did not fall under the prior consistent statement exception to the hearsay rule was harmless. Whether viewed individually or in total, it is not reasonably probable that the outcome of the trial would have been more favorable to Dawson if those statements had been redacted, let alone that their admission made the trial fundamentally unfair. (See *People v. Tran*, *supra*, 13 Cal.5th at p. 1209 [" '[t]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*' "].)

27

**B.** *Presence of Support Dog and Victim Advocate*

### 1. <u>Proceedings</u>

In a hearing prior to trial, the prosecutor informed the court and defense counsel that J.S. and K.B. requested a support dog pursuant to section 868.4, subdivision (a)(2). Defense counsel stated that he had no objection as long as the dog was qualified under the statute. The court granted the motion.

The prosecutor stated that she also intended to have the victim advocate from Stuart House sit with J.S. and K.B. during the trial, pursuant to section 868.5. The victim advocate previously sat with J.S. and K.B. at the preliminary hearing. Defense counsel objected on three bases: (1) J.S. and K.B. were adults; (2) at the preliminary hearing the court had to admonish the particular victim advocate not to touch J.S. or K.B.; and (3) because they knew the victim advocate, J.S. and K.B. might be afraid to disappoint her at trial and their testimony could be influenced. Defense counsel was not present at the preliminary hearing, but recalled the admonishment from the transcript. The prosecutor explained that J.S. was on the verge of a panic attack and the victim advocate, who was sitting behind him, touched his back to calm him. The trial court admonished the victim advocate not to touch J.S. or K.B. The victim advocate stated that she understood, and she acted appropriately for the remainder of the hearing. The prosecutor preferred to have the same victim advocate sit with J.S. and K.B. during testimony because they knew her.

The court stated that there was no requirement that a victim be a minor to be entitled to the presence of a support person. The court would admonish the advocate regarding her role prior to any testimony, including that she should refrain from touching J.S. and K.B. or coaching the witnesses in any way. The court instructed defense counsel to bring any concerns to the court's attention so that the court could address them.

Prior to testimony, the trial court orally instructed the jury under CALCRIM No. 377 as follows: " 'Presence of support person, dog, dog handler during testimony of a witness in this case, or witnesses, there may be a support animal present for the witness and a handler for the support dog. [¶] Do not consider the presence of the dog or the dog handler with the witness for any purpose, and do not allow it to distract you. The law allows a person testifying to have an advocate in the courtroom and also have an emotional support animal.' "[8]

## 2.    **Legal Principles**

Section 868.4, subdivision (a)(2) provides, in pertinent part, that either party in a criminal proceeding may request that a witness who is entitled to support persons pursuant to section 868.5 be accompanied by a therapy or facility dog while the person testifies, subject to the court's approval. The party must "make[] a showing that the therapy or facility dog and handler

---

[8] The written instructions included CALCRIM No. 377 as follows: "A witness had an emotional support dog present during his testimony. Do not consider the presence of the dog or the dog handler who was with the witness for any purpose or allow it to distract you."

are suitably qualified and will reasonably assist the testifying witness" (§ 868.4, subd. (c)), "[by] reduc[ing] anxiety or otherwise be[ing] helpful to the witness while testifying" (§ 868.4, subd. (b)(3)).  If the party meets the statutory requirements, "the court may grant the motion, unless the court finds the use of a therapy or facility dog would cause undue prejudice to the defendant or would be unduly disruptive to the court proceeding."  (§ 868.4, subd. (c).)  The court is required to take measures to ensure the therapy or facility dog is "as unobtrusive and nondisruptive as possible," (§ 868.4, subd. (d)) and "issue an appropriate jury instruction designed to prevent prejudice for or against any party" upon request (§ 868.4, subd. (e)).  A "facility dog" is defined in part as "a dog that has successfully completed a training program in providing emotional comfort in a high-stress environment for the purpose of enhancing the ability of a witness to speak in a judicial proceeding and reducing his or her stress level[.]"  (§ 868.4, subd. (h)(2).)  A therapy dog is an otherwise qualified dog "that has successfully completed training, certification, or evaluation in providing emotional support therapy."  (§ 868.4, subd. (h)(4).)

As relevant here, section 868.5, subdivision (a) provides: "[a] prosecuting witness in a case involving a violation or attempted violation of [s]ection . . . 288.5 . . . shall be entitled, for support, to the attendance of up to two persons of the prosecuting witness' own choosing, [subject to certain exceptions,] one of whom may be a witness, at the preliminary hearing and at the trial, . . . during the testimony of the prosecuting witness."  "If the person or persons so chosen are also witnesses, the prosecution shall present evidence that the person's attendance is both desired by the prosecuting witness for support and will be

30

helpful to the prosecuting witness. Upon that showing, the court shall grant the request unless information presented by the defendant or noticed by the court establishes that the support person's attendance during the testimony of the prosecuting witness would pose a substantial risk of influencing or affecting the content of that testimony." (§ 868.5, subd. (b).) Section 868.5 "does not preclude a court from exercising its discretion to remove a person from the courtroom whom it believes is prompting, swaying, or influencing the witness." (§ 868.5, subd. (b).)

### 3. Analysis

#### a. *Section 848.4 Does Not Violate the Right to Confrontation, Cross-Examination, Jury Trial, or Due Process Either Facially or As Applied in This Case.*

Dawson contends that reversal is required because his state and federal constitutional rights to confrontation, cross-examination, jury trial, and due process were violated by the presence of a facility dog during J.S.'s and K.B.'s testimony. He argues that section 868.4 is unconstitutional because it enables a witness's credibility to be falsely bolstered through use of a facility dog. Dawson asserts that, despite the fact that defense counsel agreed to the presence of a facility dog, he did not forfeit his claims by failing to object below. Regardless of whether Dawson's claims have been forfeited, we conclude that they fail on the merits.

We "apply[] the substantial evidence test to pure questions of fact and de novo review to questions of law. [Citation.]

'[W]hen the application of law to fact is predominantly legal, such as when it implicates constitutional rights and the exercise of judgment about the values underlying legal principles, [the appellate] court's review is de novo.' " (*In re Taylor* (2015) 60 Cal.4th 1019, 1035; *In re Collins* (2001) 86 Cal.App.4th 1176, 1181.)

Dawson contends that section 868.4 is unconstitutional on its face because a witness's "internal reliance" on a facility dog bolsters their testimony and gives the witness a "false aura of veracity." As we understand it, Dawson's argument is that a jury is more likely to credit a witness's testimony if the witness appears calm. Dawson points to no direct correlation between anxiety and veracity, however. The state has a compelling interest in safeguarding the physical and psychological well-being of minors and victims of sexual offenses. (*People v. Patten* (1992) 9 Cal.App.4th 1718, 1726.) Both the Legislature and courts recognize that children and victims of sexual offenses are likely to be nervous or frightened when facing an attacker in court, and can be aided in giving "complete and truthful testimony" through the use of a facility dog to control their anxiety. (See *People v. Chenault* (2014) 227 Cal.App.4th 1503, 1517 [use of a facility dog may assist the witness in avoiding "undue harassment or embarrassment and provid[ing] complete and truthful testimony"].)

Although it has not yet had occasion to evaluate section 868.4 in this context, our Supreme Court recently held that California's similar procedure for providing support persons under section 868.5 "does not require the same constitutional scrutiny" as procedures that hamper face-to-face confrontation or limit defense counsel's cross-examination of witnesses. (*People v.*

*Chhoun* (2021) 11 Cal.5th 1, 37.) Moreover, "[a] support person's mere presence in the courtroom or at the witness stand does not infringe the defendant's due process or confrontation rights unless there is evidence of improper interference by the support person." (*Id.* at p. 38.) If the presence of a human to ease a witness's anxiety does not require constitutional scrutiny, the presence of a dog creates even less cause for concern.

Additionally, section 868.4, subdivision (c) protects defendants by requiring the court to consider whether use of a facility dog would be unduly prejudicial to the defendant or unduly disruptive to proceedings. A court may disallow use of a facility dog in such instances despite the fact that the prosecution has made a showing that the presence of a facility dog would assist the witness in giving testimony. (*Ibid*.) The statute requires the trial court to "take appropriate measures to make the presence of the therapy or facility dog as unobtrusive and nondisruptive as possible[.]" (*Id.*, subd. (d).) The court must, upon request, "issue an appropriate jury instruction designed to prevent prejudice for or against any party." (*Id.*, subd. (e).) Section 868.4 also preserves the court's ability to "remov[e] or exclude[e] a therapy or facility dog from the courtroom to maintain order or to *ensure the fair presentation of evidence*[.]" (*Id.*, subd. (f), italics added.) This last provision in particular would provide for removal of a facility dog if the court found there was a significant risk that the presence of a facility dog would falsely bolster the witness's credibility. In light of the interests implicated and the statute's many protections, we conclude that section 868.4 is not unconstitutional on its face.

With respect to his argument that section 868.4 infringed his constitutional rights as applied, Dawson makes no arguments

33

that are specific to J.S. and K.B., and because he consented to use of a facility dog the record is sparse. " 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Here, we presume that the trial court made the appropriate findings to support its ruling, and there is nothing in the record that suggests the facility dog impacted the fairness of the proceedings. We find no constitutional violation or error.

> ### b. *The Trial Court Did Not Err by Instructing the Jury Under CALCRIM No. 337.*

Dawson further contends that the trial court erred in instructing the jury regarding the facility dog under a modified version of CALCRIM No. 377 because the instruction referred to the "facility dog" or "therapy dog" as an "emotional support dog." Dawson failed to challenge the wording of the instruction in the trial court, but the claim is cognizable on appeal pursuant to section 1259, which permits this court to review " 'any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby.' "

Section 868.4 defines a "facility dog" as a dog trained to provide "emotional comfort" and a "therapy dog" as a dog trained to provide "emotional support therapy." These statutory definitions make clear that any dog that accompanies a witness

pursuant to section 868.4 accompanies the witness for the purpose of emotional support. The instruction is correct in law and relates to the circumstances of the dog's presence. Dawson's substantial rights were not implicated.

> c. *Section 848.5 Does Not Violate the Right to Confrontation, Cross-Examination, Jury Trial, and Due Process.*

Dawson contends that section 868.5's procedure for providing support persons violates his constitutional rights to confrontation, cross-examination, jury trial, and due process, for the same reasons that he alleges section 868.4 does.

Dawson attempts to distinguish his arguments from those made in *People v. Chhoun*, *supra*, 11 Cal.5th 1, wherein the Supreme Court held that "[a] support person's mere presence in the courtroom or at the witness stand does not infringe the defendant's due process or confrontation rights unless there is evidence of improper interference by the support person. [Citation.]" (*Id*. at p. 38.) In *Chhoun*, the defendant argued that his Sixth Amendment right to confront witnesses was infringed because a support person was permitted to accompany a testifying witness although there was no case-specific, evidence-based showing of need. (*Id*. at p. 37.) The Supreme Court rejected the argument, stating "Concerns about improper vouching are . . . unfounded because the mere ' "presence of a second person at the stand does not require the jury to infer that the support person believes and endorses the witness's testimony, so it does not *necessarily* bolster the witness's testimony." ' " (*Ibid*.) As we previously stated with

35

respect to facility dogs, Dawson has offered no evidence that there is a direct correlation between anxiety and veracity. The presence of a support person will not " ' "*necessarily* bolster the witness's testimony." ' " (*Ibid*; see also *Chenault*, *supra*, 227 Cal.App.4th at p. 1515 ["[a]lthough it is possible in certain circumstances that a support dog might cause a jury to consider impermissible factors in deciding a defendant's guilt, we conclude that scenario will not necessarily, and likely will only rarely, result when a support dog is used to comfort a testifying witness"].) *Chhoun* controls. The defendant's rights to due process and confrontation are not implicated "unless the support person improperly interferes with the witness's testimony, so as to adversely influence the jury's ability to assess the testimony[.]" (*People v. Spence* (2012) 212 Cal.App.4th 478, 514.)

With respect to the specific circumstances of this case, Dawson has offered no evidence that the Stuart House advocate improperly interfered with J.S. or K.B.'s testimony. He is therefore unable to establish that section 868.5 is unconstitutional as applied.

> ### d.     *Section 848.5 Does Not Violate the Separation of Powers.*

Dawson contends that section 868.5 violates the separation of powers doctrine because it impinges on the judiciary's control over criminal trials and the prosecutor's ability to call witnesses and conduct trials. He argues that once the prosecuting witness invokes the right to have a support person, the trial court has no power to deny the request other than when the support person is also a witness. The prosecutor, in turn, has no ability to refuse

the witness's request to have a support person, even if the prosecutor determines that it is not in the best interests of the prosecution for the witness to have a support person.  The contentions lack merit.

We review separation of powers claims de novo.  (*In re Ilasa* (2016) 3 Cal.App.5th 489, 498.)  " 'The powers of state government are legislative, executive, and judicial.  Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.'  (Cal. Const., art. III, § 3.)  Although the separation of powers doctrine 'does not prohibit one branch from taking action that might affect another, the doctrine is violated when the actions of one branch defeat or materially impair the inherent functions of another.'  (*Steen v. Appellate Division of Superior Court* (2014) 59 Cal.4th 1045, 1053.)  'Separation of powers does not mean an entire or complete separation of powers or functions, which would be impracticable, if not impossible.' [Citation.]" (*In re D.N.* (2022) 14 Cal.5th 202, 212.)  " 'When one department or agency thereof exercises the *complete* power that has been by the Constitution expressly limited to another, then such action violates the implied mandate of the Constitution.' [Citation.]" (*In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1236.)

" 'Our Constitution vests "[t]he legislative power of this State . . . in the California Legislature which consists of the Senate and Assembly . . . ." (Cal. Const. art. IV, § 1.)  It is in the nature of state constitutions that they, unlike the federal Constitution, generally do not grant only limited powers. (*Marine Forests Society v. California Coastal Com*. (2005) 36 Cal.4th 1, 29.)  Consequently, "unlike the United States Congress, which possesses only those specific powers delegated to

37

it by the federal Constitution, it is well established that the California Legislature possesses *plenary* legislative authority except as specifically limited by the California Constitution." (*Id.* at p. 31.) Lying at the core of that plenary authority is the power to enact laws. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 254.) It has been said that pursuant to that authority, "[t]he Legislature has the *actual* power to pass any act it pleases," subject only to those limits that may arise elsewhere in the state or federal Constitutions.' (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 497–498.)" (*People v. Nash* (2020) 52 Cal.App.5th 1041, 1074.) "This essential function embraces the far-reaching power to weigh competing interests and determine social policy. [Citations.]" (*People v. Bunn* (2002) 27 Cal.4th 1, 14–15.)

In promulgating section 868.5, the Legislature acted within its power to enact legislation to protect the interests of children and victims of sexual offenses. Whether a support person will accompany a witness at trial lies predominantly with those witnesses and not with any branch of government. Moreover, the respective purviews of the executive and the judiciary are only minimally impacted. Although Dawson reads section 868.5 to strip courts of the power to control whether support persons are present where the support person is not a witness, the statute is not so narrow. Section 868.5, subdivision (b) provides that "[t]his section does not preclude a court from exercising its discretion to remove a person from the courtroom whom it believes is prompting, swaying, or influencing the witness." By the plain meaning of the words, "this section" refers to section 868.5 in its

entirety, and thus to all support persons authorized therein.[9]
(See *People v. Valencia* (2017) 3 Cal.5th 347, 357 [if language is
clear courts do not look beyond its plain meaning].)  In light of
defense counsel's objection to the Stuart House victim advocate
based on her previous behavior and the trial court's ruling
thereon, it appears that the court and the parties understood that
the court had discretion to exclude the Stuart House victim
advocate if her presence would improperly interfere with the
testimony.  Section 868.5, subdivision (b) also provides a basis for
the prosecution to move the court to remove a support person
from the courtroom if the prosecutor believes the witness is
"prompting, swaying, or influencing the witness."  The separation
of powers doctrine is not implicated.

## C.    *Adoptive Admission Instruction*

### 1.    Legal Principles

Pursuant to Evidence Code section 1221, "[e]vidence of a
statement offered against a party is not made inadmissible by the
hearsay rule if the statement is one of which the party, with
knowledge of the content thereof, has by words or other conduct
manifested his adoption or his belief in its truth."  Our Supreme
Court has explained, " '[i]f a person is accused of having
committed a crime, under circumstances which fairly afford him

---

[9] To the extent that Dawson disagrees, he offers no
argument or authority to support a contrary interpretation, and
has waived any challenge he may have raised on appeal.  (See
*People v. Duff* (2014) 58 Cal.4th 527, 550 fn. 9, [issues not raised
in appellant's opening brief are waived].)

[or her] an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he [or she] was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he [or she] fails to speak, or he [or she] makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' " (*People v. Cruz* (2008) 44 Cal.4th 636, 672, quoting *People v. Preston* (1973) 9 Cal.3d 308, 313–314.) " 'For the adoptive admission exception to apply, however, a direct accusation in so many words is not essential.' [Citation.] ' "When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence." [Citation.]' [Citation]." (*People v. Jennings* (2010) 50 Cal.4th 616, 661.)

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) Conversely, a trial court commits error by instructing the jury on adoptive admissions when there is insufficient evidence of any element of an adoptive admission. (*People v. Chism* (2014) 58 Cal.4th 1266, 1297–1298.) We review de novo whether a jury instruction was supported by substantial evidence. (*People v. Parker* (2022) 13 Cal.5th 1, 68.) "To warrant admissibility, it is sufficient that the

evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011.)

## 2. <u>Analysis</u>

Dawson contends that the trial court erred in instructing the jury pursuant to CALCRIM No. 357 regarding adoptive admissions because the instruction was not supported by the evidence. Dawson admits that he did not object to the adopted omission or CALCRIM No. 357 at trial, but argues that this court must review the alleged instructional error because it affected a substantial right. The People respond the claimed instructional error was forfeited, but that regardless, substantial evidence supports the instruction. We conclude that the trial court did not err because the evidence was sufficient to support the inference that Dawson tacitly admitted that he made K.B. masturbate him. Dawson's substantial rights are not implicated and the claim has been forfeited.

In her Stuart House interview, K.B. stated that she and Nicole confronted Dawson about Dawson making K.B. masturbate him. Dawson did not deny that K.B.'s accusation was true. K.B. described the incident as follows:

"[K.B.:] And that's when—I just remember we was going back—I was telling her what I remember. I don't remember what I said because I was kind of younger. But all I know is that she knew. And we were going to approach him. He was asleep. We

41

were going into the room and woke him up. We was talking and talking and talking. And all I remember is crying saying that I wanted him to stay in the house, but I didn't know any better. I wanted him to stay in the house. He's sorry. You know? [Unintelligible] never do it again. And that was just that.

"[Interviewer:] Was he saying he was sorry?

"[K.B.:] Yeah. I, I think he—I'm not sure.

"[Interviewer:] Okay.

"[K.B.:] I can't really give you a sure answer. But I know she ended up forgiving him."

K.B.'s statements support the conclusion that K.B. accused Dawson of a crime, that he was able to hear, understand, and to reply, and that he was not relying on his Fifth Amendment right to remain silent. K.B. was unequivocal that she told her mother about Dawson making her masturbate him and that she was present when her mother told Dawson that K.B. claimed he had abused her. Dawson was awake and they "talked and talked," which afforded him ample opportunity to reply.

K.B.'s statements also provide substantial evidence that Dawson adopted her accusation as true. K.B. was in approximately second grade when she and her mother confronted Dawson about the abuse. Although she could not remember his exact words upon hearing her accusation, she remembered their import and paraphrased his response: "He's sorry. . . . [N]ever do it again." She also stated that her mother responded by "forgiving him." The jury could reasonably infer that Dawson's response was not a denial that the abuse occurred, but rather an admission that K.B.'s accusation was true.

We reject Dawson's suggestion that because he and Nicole testified that the conversation never occurred, K.B.'s statements

provide insufficient evidence to support the instruction. All that is necessary is that the jury is presented with some evidence that would sufficiently support the conclusion that Dawson made an adoptive admission. (See *People v. Alexander* (2010) 49 Cal.4th 846, 921.) How much weight to give that evidence with respect to conflicting evidence was for the jury to decide.

## D.    *Prosecutorial Misconduct in Closing Statements*

### 1.    <u>Legal Principles</u>

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1402–1403.) "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

43

" '[A] "prosecuting attorney has a wide range in which to state his views as to what the evidence shows and the conclusions to be drawn therefrom[.]" ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 336.) " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citation.]" (*Id.* at p. 337.) Prosecutors are " 'prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of [his or her] office behind a witness by offering the impression that [he or she] has taken steps to assure a witness's truthfulness at trial.' " (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1269–1270, disapproved of on another ground by *People v. Rodriguez* (2020) 9 Cal.5th 474, 485.) "[A]ny allegedly improper statements by the prosecutor must be considered in light of the entire argument. [Citation.] ' "In conducting [our] inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' [Citation.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 789 (*Holmes*).)

### 2. Analysis

Dawson contends that the prosecutor engaged in repeated misconduct when making her closing statement to the jury. Dawson did not object to any of the prosecutor's alleged misconduct at trial. To avoid forfeiture, a defendant must timely

44

and specifically object to any perceived misconduct. (*People v. Rivera, supra*, 7 Cal.5th at p. 334.) Dawson has forfeited his claims by failing to raise the issues below. Regardless, none of his contentions have merit.

### a. *Propensity Evidence*

Dawson first contends that the prosecutor introduced uncharged offense evidence in closing argument despite agreeing that she would not do so. He asserts that the prosecutor misled the jury into believing that they should consider uncharged offenses in conjunction with CALCRIM No. 1191B, which instructed the jury that if it found the defendant guilty of one charged offense beyond a reasonable doubt it could consider the commission of that offense as evidence that the defendant had the propensity to commit sexual abuse, and based on that decision decide that the defendant was likely to commit the other charged offense. Dawson's argument has no merit. The prosecutor properly explained how the jury could use the charged crimes as propensity evidence and did not mention uncharged crimes evidence.

Prior to trial, the court held a hearing at which the parties discussed whether J.G., a third alleged victim, would be able to appear as a complaining witness. The prosecutor represented that if J.G. was unable to appear, the prosecutor would drop the charges relating to J.G. and refrain from arguing that the facts of the offenses against J.G. were evidence of Dawson's propensity to commit sexual abuse. J.G. was unable to appear at trial, and the charges related to her were dismissed.

In closing argument the prosecutor made the following remarks, to which Dawson objects: "There is a special way in the law and you received a jury instruction on it—to consider propensity to commit a crime. You can consider it when you find somebody has committed a sex act that is other than the crime you are looking at, you can use that to decide whether or not they committed another sex act because they have a propensity to do that kind of thing." Immediately following the remarks Dawson complains of, the prosecutor explained that the jury must consider the two charged offenses separately, but that if "you analyze count 1 first, and you agree that that's been proven beyond a reasonable doubt, you may then conclude that you can use that evidence that the defendant was likely to commit and did commit the other charged sex act."

We find no misconduct. The prosecutor properly explained how charged crimes may be used as propensity evidence. She only discussed Dawson's acts relating to J.S. and K.B. She did not reference J.G., and J.G. was never mentioned at trial.[10]

---

[10] Dawson states, without further argument, that the prosecutor told the jury that it could use uncharged crimes as circumstantial evidence of charged crimes. This is inaccurate. The prosecutor stated that it was only necessary for the jury to find three sexual acts against each victim within the alleged time period. The prosecutor stated that, because both witnesses testified to more than three incidents, the jurors could consider their testimony regarding additional sex acts as circumstantial evidence that the conduct was ongoing.

### b.    *Adoptive Admission Evidence*

Dawson also argues that the prosecutor improperly filled in gaps in K.B.'s Stuart House interview statements and testimony when she argued that the jury could consider as an adoptive admission Dawson's response to Nicole's accusations that he abused K.B.  Dawson asserts that the prosecutor impermissibly acted as her own witness.

Specifically, Dawson objects to the prosecutor's statement that:  "[K.B.] told us mom came in and said did these things happen with you and [Dawson] and [K.B.] started crying and said yea."  "She woke [Dawson] up and she said, 'Hey, what the hell?  What are you doing to my daughter?  She says you are touching her."  "[Dawson] didn't say absolutely not.  I did not touch her, I never would.  He said, 'I'm sorry, I'm sorry, I'm sorry.' "

A criminal prosecutor has "much latitude" in closing argument, and may make a "strongly worded and vigorous" argument as long as it "fairly comments on the evidence" or "asks the jury to draw reasonable inferences" from that evidence. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1330.)  "Counsel is not permitted to 'assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]'; however, the reasonableness of inferences counsel draws from matters in evidence ' " 'is for the jury to decide.' " ' "  (*Holmes, supra*, 12 Cal.5th at p.787.)

As we discussed in Section C above, K.B. did not remember the exact words that Dawson used in response to Nicole's accusations.  She also did not directly quote what her mother said during the conversation.  Before making the remarks Dawson

47

complains of, the prosecutor reminded the jury that K.B. did not "give us all the verbatim description of the conversation." The prosecutor did not represent that she was quoting testimony. Using inferences from the facts, the prosecutor summarized the confrontation in the form of a conversation to convey the events as she viewed them in an accessible manner.

One could reasonably infer that after hearing Dawson sexually abused her daughter, Nicole would question Dawson vigorously and even use profanity when doing so. K.B. testified and stated in her interview that she told her mother Dawson made her masturbate him. When asked what she would do if K.B. told her that Dawson had abused her, Nicole testified, "I would not allow it. I will take it in my own hands. I'm sorry, but if I can speak my own truth, no, I wouldn't let anyone hurt my babies." Nicole further testified that if she found out that the accusations were true, she would kick Dawson out of the house "if he was still alive."

The prosecutor's description of Dawson's response was also based on reasonable inferences from the evidence. Although K.B. could not recall Dawson's exact words, she knew their import—Dawson was sorry and would not abuse her again. The evidence supported the conclusion that rather than denying the accusation Dawson asked for forgiveness, even if he did not use the word "sorry."

Additionally, the trial court instructed the jury that "You must decide what the facts are. It is up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial." The court further explained that " '[e]vidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you

48

to consider as evidence.  [¶] Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witnesses' answers are evidence."  The court further instructed the jury that:  "The court reporter has made a record of everything that was said during the trial.  If you decide that it is necessary, you may ask that the court reporter's record be read to you.  You must accept the court reporter's record as accurate."  "[W]e presume a jury understands and follows the court's instructions, and ' "treat[s] the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate. . . ."  [Citation.]' "  (*People v. Cortes* (2022) 75 Cal.App.5th 198, 205.)

In light of the circumstances, we cannot conclude that "there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."  (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.)

### c.      *Adoptive Admission Instruction*

At trial, the court instructed the jury regarding adoptive admissions under CALCRIM No. 357:

"If you conclude that someone made a statement outside of court that accused the defendant of the crime, and the defendant did not deny it, you must decide each of the following is true:

"1.  The statement was made to the defendant or made in his presence;

"2.  The defendant heard and understood the statement;

49

"3.  The defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true;

"AND

"4.  The defendant could have denied it but did not.

"If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.

"If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

Dawson contends that the prosecutor inaccurately described the instruction on adoptive admissions.  Dawson argues that the prosecutor misstated the law when she stated: "Adoptive admission.  That you would shout, don't accuse me of that.  Absolutely not.  That if it didn't happen and you believe the accusation was made that you can take that into consideration as an admission."

Dawson does not explain what he believes is inaccurate about the prosecutor's statement, and he omits the remainder of the prosecutor's explanation of adoptive admissions.  The prosecutor continued, "So in this case what [K.B.] told us was that Nicole confronted [Dawson] and she said, why are you molesting my daughter?  In so many words.  And I would put to you that statement was made to [Dawson] in his presence of course because he was asleep and they woke him up to make that accusation, that he heard and understood that statement, and that he would under all circumstances that are—that a reasonable person would consider naturally have denied that if he thought it wasn't true, and he could have.  Meaning he had a

voice to do so or a pen and paper to write it down or a way to communicate that denial, but he didn't. He apologized. [¶] If you decide these points of this particular jury instruction are met, that these things are true based on the testimony you've heard and the videos, you can conclude he admitted that statement, that accusation was true that he was admitting he molested [K.B.] by not denying."

When viewed as a whole the prosecutor's remarks accurately reflect the law of adoptive admissions and the instruction given. To the extent that it was an exaggeration to state that a person must "shout" that the accusation is untrue, it was an exaggeration that could only benefit Dawson. The law of adoptive admissions requires only that an accusation be made under circumstances in which a person would normally deny the accusation was true. The prosecutor's formulation contemplated a more extreme scenario that would not apply to all adoptive admissions.

### d. Date Range Instruction

In closing argument, the prosecutor remarked, "The judge instructed you about *because of the nature of these crimes it is very difficult for the victims of these crimes to look back and remember an exact date*. That's why you get a large range because they are telling you from the stand and testimony if you believe them this is when these things happened in this range." (Italics added.) In fact, the court's instruction did not include the rationale behind the rule. It simply stated that it was not

51

necessary for the jury to find that the crimes took place on a specific date.[11]

Dawson contends that the prosecutor improperly relied upon the prestige of the court by stating that the court instructed the jury that it is difficult for child abuse victims to remember exact dates. We think it more likely that the prosecutor mistakenly merged the instruction given with the rationale behind the rule, which is not included in the standard instruction. The reason given by the prosecutor was a correct statement of the Legislature's purpose in promulgating section 288.5. As one Court of Appeal long ago explained, "When a minor is subjected to repeated acts of sexual molestation over an extended period, that minor's memory of events can tend to blur and the minor can have difficulty remembering and testifying to specific events in sufficient detail to support a conviction. To remedy that problem, the Legislature created the new crime set forth in section 288.5: 'continuous sexual abuse of a child.' This new crime lightens the prosecution's burden by dispensing with the need to prove specific events." (*People v. Gohdes* (1997) 58 Cal.App.4th 1520, 1528 disapproved on another ground by *People v. Rodriguez* (2002) 28 Cal.4th 543.) Because the prosecutor's comment correctly described the reason that juries are permitted to convict a defendant of continuous sexual abuse of a child based

---

[11] The court instructed the jury under CALCRIM No. 207 as follows: "It is alleged that the crime in Count 1 occurred on or between the dates of November 28, 2007, and November 27, 2017.

"It is alleged that the crime in Count 2 occurred on or between the dates of January 20, 2007, and January 19, 2013.

"The People are not required to prove that the crimes took place exactly on a certain day but only that they happened within the above stated date ranges."

on acts that occurred within a date range, the jury could not have applied the prosecutor's misstatement that the rationale was included in the instruction to Dawson's detriment. Finally, the jury was provided with written instructions, and was told that it must follow the instructions as given. Dawson's substantial rights were not impacted.[12]

### e. "Expert" Opinion

Dawson complains that the prosecutor testified as an expert witness on delayed reporting by stating that, "It became such a mental trauma over the years [J.S. and K.B.] couldn't keep it inside anymore and they had to tell somebody. [¶] That's why we're here. That's why sometimes victims of these crimes report so late because they have to try to deal with the trauma and they realize they can't and they have to tell and that's exactly what you heard from the witness stand."

We disagree with Dawson's characterization of the prosecutor's comments. The prosecutor's statement—that victims of childhood abuse "sometimes" disclose their abuse later because they are processing trauma—was a common sense explanation for J.S. and K.B.'s behavior that had a basis in the record.

---

[12] In the same paragraph of the opening brief, Dawson mentions that the prosecutor "vouched by twice offering personal opinions." Dawson does not explain how the prosecutor's statements constituted improper vouching or prejudiced him and he did not include the content of the prosecutor's opinions, so we will not address the issue.

Defense counsel responded by suggesting that the prosecutor's explanation represented her own opinion. He suggested that the behavior would be better explained by an expert, but then went on to offer his own view: "Why would someone wait so long to report horrific conduct? That's a defect in this case."

We cannot conclude that the jury would have accepted the prosecutor's statement as truth and disregarded defense counsel's argument. As we have discussed, the jury was instructed that counsels' arguments were advocacy, and that the jury alone was charged with determining facts. We presume that the jurors followed the trial court's instructions, weighed the evidence independently, and came to their own conclusions.

### f.     *Forensic Evidence*

We reject Dawson's argument that the prosecutor misled the jury into believing that the Stuart House interviews were "scientifically reliable" by referring to them as "forensic" interviews. As we stated in Section A of this opinion, "forensic" is an accurate description of the interviews, which were created to preserve evidence for prosecution in court.

### g.     *Pastor's Relationship*

We also reject Dawson's argument that the prosecutor inaccurately stated that Pastor Grimes "didn't know the family during the time period these alleged crimes were occurring" because K.B. had testified that Dawson abused her until she was 17 years old. Dawson argues that the prosecutor should have

54

stated Pastor Grimes did not know the family at the time that the *charged* crimes were occurring—i.e., when J.S. and K.B. were less than fourteen years old. In context, it is clear that the prosecutor was referring to the time periods during which the charged crimes occurred:

"Pastor Grimes . . . didn't know the family during the time period these alleged crimes were occurring. He knew them in the 18 months before the report which is after the substantial conduct ended. And it's not the time period that's alleged."

We find no misconduct.[13]

### h. Other Uncharged Offenses

Dawson contends that the prosecutor improperly introduced evidence of uncharged offenses against other victims. He asserts that the prosecutor inserted J.S. and K.B.'s Stuart House statements about other children who had contact with Dawson, and resurrected the specter of J.G., the alleged victim in charges that were dismissed prior to trial.

The prosecutor made no mention of other crimes in her closing statement. As we discussed in Section A, in his closing statement defense counsel argued that there was no evidence that complaints had been filed against Dawson although he worked with elementary school children for many years. In rebuttal, the prosecutor briefly addressed defense counsel's

---

[13] Dawson also complains that, because he was arrested during the pandemic, the prosecutor unfairly argued that Pastor Grimes "hadn't spoken to the defendant since he was arrested. Did not see him nor talked to him on the phone". The argument lacks merit.

argument: "It is not in front of you to consider whether or not all of the victims of Mr. Dawson are here. They may be. They may not be. You are to consider the case that is in front of you and not what else might be happening in a court system. You are not allowed to speculate outside of the evidence that you have."

It was not inappropriate for the prosecutor to re-focus the jury's attention on the case before them. She correctly pointed out that the question at trial was whether Dawson had sexually abused J.S. and K.B. on the evidence presented.[14]

### i.     *Exploiting Fear and Emotion*

Finally, Dawson contends that the prosecutor exploited the jury's fears and emotions by suggesting that J.S. and K.B. would be impacted by Dawson's abuse for life. Specifically, Dawson complains the prosecutor argued that neither J.S. nor K.B. "think they are going to be able to get over the trauma put onto them when they were so young by Mr. Dawson because he broke that level of trust[,]" and "He did this to them and they will live with this for the rest of their [lives]."

Even if Dawson's argument had not been forfeited for failure to object at trial, any error was harmless, as the

---

[14] As Dawson concedes, the jury was never told that J.G. was an alleged victim. J.G.'s initials were mentioned once in voir dire when the trial court read aloud "a large list of witnesses" in the matter, some of whom "definitely . . . will not be called." Dawson's contention that the jury would have pieced together that J.G. had been an alleged victim in charges that were dismissed before trial and then convicted Dawson to spare J.G. from the ordeal of testifying in a different court case is highly speculative.

prosecutor's arguments were brief and not inflammatory.  It is common knowledge that the victims of child sexual abuse live with the consequences throughout their lives.  Additionally, the trial court instructed the jurors that they could "not let bias, sympathy, prejudice, or public opinion influence [their] assessment of the evidence or [their] decision."  (CALCRIM No. 200)  The jury is presumed to have followed the trial court's instructions.

## DISPOSITION

We affirm the trial court's judgment.
NOT TO BE PUBLISHED.


MOOR, J.

We concur:


BAKER, Acting P. J.


KIM, J.